UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ESTATE OF TIMOTHY DEVINE,<br>    Plaintiff,<br><br>    v.<br><br>LOUIS FUSARO, JR., et al,<br>    Defendants. | No. 3:14-cv-01019 (JAM) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is a tragic case about a young man—Timothy Devine—who shot and killed himself with his gun after several hours of a stand-off with the police on a campus of the University of Connecticut. Plaintiff is Devine's estate and contends that the police wrongfully provoked Devine to kill himself. While negotiations were ongoing with Devine, the police tried to end the stand-off by means of a surprise tactic of detonating flash grenades and shooting Devine with rubber baton projectiles that are designed to be very painful. Rather than prompting Devine to drop or surrender his gun, this tactic led Devine to kill himself.

According to plaintiff, the police defendants' use of force on Devine was excessive in violation of the Fourth Amendment. Viewing the facts as I must in the light most favorable to plaintiff, it is easy to see why plaintiff would question the soundness and wisdom of defendants' decision to escalate the encounter and to use force as they did against Devine while negotiations for his peaceful surrender were still ongoing. But regardless of these concerns, I conclude that defendants are entitled to qualified immunity—that their use of force was not objectively unreasonable in violation of clearly established law. I will therefore grant defendants' motion for summary judgment as to the constitutional claim of excessive force and otherwise dismiss the remaining state law claims for lack of federal jurisdiction.

1

## BACKGROUND

The following facts are based on the parties' submissions and are viewed in the light most favorable to plaintiff.[1] On the evening of July 23, 2012, a police detective from the Town of Groton, Connecticut called Timothy Devine to ask him to come to the police department. The detective told him that she wished to discuss allegations of serious and scandalous criminal misconduct that had been made against Devine. At first, Devine agreed to come but then called back to say that he would not meet with the detective. He told the detective that he had his "Sig" on his lap and was pulling the hammer back and that "if a single person walks up on me, I will put a round through my head." Doc. #24-21 at 3.[2]

Devine was 30 years old. He owned a local training gym and was a firefighter with a local fire department. In light of the police investigation, Devine called a close friend, Jeffrey Douchette, who was Devine's supervisor at the fire department. Douchette concluded after speaking with Devine that Devine was going to kill himself. According to Douchette, Devine told him that he had said goodbye to his parents and that he was going to hide $12,000 in cash for his burial and would text Douchette with the cash location before he killed himself. Devine also asked Douchette where he should put the gun against his head so that it would not hurt.

The police issued a "Be on the Lookout" dispatch for Devine's vehicle. At about 10:00 p.m., they located it in a parking lot at the University of Connecticut's Avery Point campus in

---

[1] Defendants have filed a detailed statement of material facts with citations to supporting evidence (Doc. #24-21). To the extent that plaintiff's own statement of material facts (Doc. #28-1) simply denies factual allegations of defendants' statement but without identifying contrary evidence, the Court credits defendant's factual assertions. *See* D. Conn. L. Civ. R. 56(a)(3).

[2] Although plaintiff has denied what Devine reportedly told the local police detective, he has not presented any facts to controvert these statements that were made by Devine as recounted in the detective's police report, and I conclude that there is no circumstantial evidence that casts doubt on the reliability of Devine's statements as set forth in the detective's report. *See O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); *see also Flythe v. Dist. of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015).

Groton. The seaside campus borders the Long Island Sound, and the police soon found Devine out on some rocks by the water adjoining a lawn area. Devine was holding a gun to his head.

Douchette soon joined the police at the scene, and he spoke to Devine but could not convince him to come ashore from the rocks and not to kill himself. According to Douchette, Devine asked him to come sit with him on the rocks, but the police would not let Douchette do so because Devine had a gun.[3]

At about midnight, a Groton police officer with training as a crisis negotiator arrived. The Groton officer spoke at length by telephone with Devine until about 1:45 a.m. Devine refused to relinquish his gun and remained insistent that he was going to commit suicide.

In the meantime, the local police had requested assistance from the Connecticut State Police's Emergency Services Unit (ESU), which is a special SWAT team unit of the State Police that responds to crisis situations throughout the state. About two dozen members of the ESU eventually arrived and took control of the scene from the local police.

Plaintiff has filed this lawsuit against four members of the ESU team. The commander of the team was defendant Louis Fusaro, Jr., and three other members of the ESU who responded to the scene were defendants Steven Rief, Michael Avery, and Kevin Cook. Despite the fact that each of these four defendants arrived well into the stand-off, it is undisputed that they learned and knew about the nature of the criminal investigation of Devine, his stated intent to commit suicide, and the fact that he was armed with a gun.

The ESU set up an armored vehicle about 25 yards from Devine and a command post of several other vehicles further back from where Devine was on the shoreline rocks. Because of the lateness of the hour and the police's large-scale presence and efforts to secure the scene, I

---

[3] The parties dispute whether Douchette was told by Devine that he would give him his gun. I need not resolve this dispute, because there is no evidence to suggest that Douchette told this to any of the defendants that plaintiff has sued in this action.

3

readily conclude—in viewing the facts most favorably to plaintiff—that there was no plausible threat by Devine to the safety of any students or civilians.

One of the ESU members, Sergeant Christopher Bartolotta, was a highly experienced crisis negotiator, including negotiation with suicidal persons. He joined the Groton police officer who was already negotiating with Devine by telephone and then eventually took over communications with Devine. When Devine's telephone stopped working, Bartolotta spoke to Devine through a public address system and then by moving forward toward the rocks and shouting back and forth with him.

Still, Devine would not give up his gun or come in from the rocks. During this time, Devine paced along the rocks, sometimes holding the gun to his head and sometimes simply holding the gun in his hand. He alternated which hand held the gun as he paced, keeping the gun towards the ocean rather than towards the officers on land. Devine never pointed the gun at the officers or any other third party, and he did not threaten to harm anyone but himself.

Some of Devine's family members also arrived on the scene. The ESU, however, did not allow Douchette or Devine's family members to talk to Devine. The parties sharply differ about whether it would have been helpful to allow them to speak with Devine. According to Bartolotta, his training strongly discouraged the introduction of a family member into negotiations with a suicidal person. But according to plaintiff and Douchette, the use of Devine's family to convince him to surrender would have been successful in persuading him to surrender his gun and return to safety.

At approximately 3:00 a.m., ESU officers met at the command post and talked about what to do next. About five hours had now elapsed with Devine on the rocks. The ESU officers discussed attempting to use a K-9 dog, attempting to shoot Devine with a taser, and attempting to

surprise Devine by coming up on him by boat from the water. Each of these options was rejected for various tactical reasons. The ESU officers settled upon a plan to try to end the stand-off by means of surprising Devine with the detonation of flash grenades and then by shooting him with hard rubber batons that would cause him to drop or surrender his gun. The ESU officers were equipped with specialized baton launchers that shoot heavy rubber batons from a rotary-style magazine.

Douchette was standing near the command post, and he heard defendants discussing the plan to use the batons and about how they would get across the rocky terrain fast enough after Devine was hit with the batons. He also heard them discussing a concern that the sun would come up soon and that they would lose their tactical advantage after the sun rose.[4]

According to Douchette, he told the ESU team members that the baton rounds would not work on Devine: "It's just going to piss him off. Have you seen the guy? He's a machine." Doc. #29 at 6. The ESU members, however, did not respond to Douchette's concern. Douchette allegedly heard defendant Rief say: "If he shoots himself it would be an acceptable outcome, and it won't be on us." *Ibid.*

At about 3:30 a.m., the ESU officers executed their grenade-and-baton plan. At that point, Bartolotta was still engaged with Devine in casual conversation. According to Douchette, Devine was "joking around with the negotiator, criticizing the value of long distance running vers[u]s other types of exercise, like Crossfit." *Ibid.*

The ESU tactical unit suddenly released two flash grenades to the left of the armored vehicle. Defendants Avery and Cook then each fired batons at Devine, striking Devine's body several times in the upper thighs and buttocks, right hand, and left calf. But the batons did not

---

[4] Plaintiff misstates the content of Douchette's affidavit with respect to this fact and incorrectly claims that the ESU officers did not discuss concern about sunrise. *Compare* Doc. #28-1 at 16 (¶ 37), *with* Doc. #29 at 5-6 (¶ 32). The sun would begin to rise at about 5:30 a.m., two hours after defendants fired upon Devine with the batons.

cause Devine to release his grip on his gun. In response, Devine said, "F***, what are you doing? I am still talking." *Ibid.* Holding the gun to his head, he then said, "You guys are going to make me do this!" *Ibid.*

Defendant Rief instructed defendants Avery and Cook to "hit him again." *Ibid.* It took them several minutes to reload their baton launchers and then to fire another six to eight batons at Devine. After being struck by the second round of batons, Devine shot and killed himself. The police recovered a suicide note from his pocket.

Plaintiff has filed suit against defendants, alleging in principal part that they violated Devine's constitutional right to be free from the use of excessive force. Plaintiff further contends that defendants recklessly caused Devine's death in violation of Connecticut state law. Defendants have now moved for summary judgment.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a

'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *The Fourth Amendment and the Right to Be Free from Excessive Force*

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Because the Fourth Amendment protects against unreasonable seizures, it has long been recognized that the Fourth Amendment is violated when the police use excessive force against a free person for the purpose of arresting or restraining his or her freedom of movement. *See, e.g., Graham v. Connor*, 490 U.S. 386 (1989).[5]

As the Supreme Court has explained, whether law enforcement officers' use of force is "excessive" must be judged by "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Ibid.*

Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

---

[5] The complaint in this case states claims for excessive force under both the Fourth and Fourteenth Amendments. It is unclear whether plaintiff relies on the Fourteenth Amendment solely for state-actor incorporation purposes. But, even assuming that defendants' conduct were analyzed in terms of the Due Process Clause apart from specific Fourth Amendment protection, the analysis and outcome in this case would be the same. *See Graham*, 490 U.S. at 395; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015) (Scalia, J., dissenting) (describing several provisions of Constitution that may protect against use of excessive force in differing contexts).

7

rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97; s*ee also Brown v. City of New York*, 798 F.3d 94, 100-03 (2d Cir. 2015) (discussing Fourth Amendment standard for excessive force claims).

### *Qualified Immunity for Claims of Excessive Force*

Not every violation of the Fourth Amendment will warrant an award of money damages, because law enforcement officers are entitled to qualified immunity if their actions were not objectively unreasonable in light of the facts known to them at the time. The purpose of qualified immunity is to allow government officials to do their jobs free from doubt that they will be sued and held liable for money damages for actions they took that an objectively reasonable official at the time would not and should not have reasonably known to violate anyone's rights. For this reason, the qualified immunity rule "protects all but the plainly incompetent or those [government officials] who knowingly violate the law." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (*per curiam*). Likewise, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks,* 134 S.Ct. 2369, 2381 (2014).

Qualified immunity protects an officer from suit if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 263 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023

(2014). Thus, qualified immunity protects an officer from liability if, on the basis of the facts known to the officer when he engaged in the conduct at issue, "officers of reasonable competence could disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 164-65 (2d Cir. 2010).[6]

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1842 (2015). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Ibid.* (internal quotations omitted). Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the . . . constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308.

### *Qualified Immunity for Defendants' Use of Force Against Devine*

In light of this legal framework that governs the application of qualified immunity, my first and critical task is to define at the appropriate level of specificity what right is at issue in this case. It is only by properly defining the right at issue that I can, in turn, draw a conclusion about whether that right was one that was clearly established, and whether it would and should have been apparent to defendants that they were violating that right. *See Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (noting how "courts must calibrate, on a case-by-case basis,

---

[6] Notwithstanding the use of similar terminology, the fact that an officer has been found to have acted "unreasonably" in a manner that violates the Fourth Amendment does not compel a corresponding conclusion that the officer has acted "objectively unreasonably" and therefore outside the scope of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 204-06 (2001), *modified on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Anderson v. Creighton*, 483 U.S. 635, 643-44 (1987); *see also* John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207, 264-65 (2013).

how generally or specifically to define the right at issue" for purposes of making a qualified immunity determination).

On the one hand, it would be too general to define the right at issue here to be merely "the right to be free from a violation of the Constitution" or "the right to be free from the use of excessive force." That very broad framing of the right in purely legally conclusory terms takes no consideration of the factual context in which a law enforcement officer has acted—it begs us to ask what facts make the use of force "unconstitutional" or "excessive." As the Supreme Court has noted, "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015).

Nor is it appropriate to define the right at issue without reference to the full range of circumstances that should matter to a determination of constitutional reasonableness. For example, it would not be appropriate here to define the right merely as "the right to be free from the use of less-than-lethal force," because even this somewhat fact-laden framing does not take account of additional factual circumstances that bear on whether the use of less-than-lethal force was reasonable in this context (*e.g.,* whether the suspect was armed or threatening or whether the police considered or tried other alternatives not involving any force at all).

For similar reasons, the right at issue should not be defined by reference to extraneous facts or circumstances that are not germane or important to evaluating the reasonableness of what the police officers did. For example, it would not be appropriate to define the right at issue in terms of "the right to be free from excessive force at a coastal location in Connecticut at 3:30 in the morning."[7]

---

[7] And for this reason I reject defendants' extensive and inflammatory reliance on the specific nature of the alleged criminal conduct engaged in by Devine. The life of a person who has been accused of criminal misconduct is

In light of these considerations, I conclude that there are three important factual circumstances that bear on the constitutional reasonableness of the defendants' use of force in this case. First, the police used a type of force that is designed to be less-than-lethal, rather than using deadly force. The degree of force is plainly relevant to its reasonableness. Second, the police used less-than-lethal force against a man whom they reasonably believed to be suicidal and to be armed with, and holding, a loaded gun while occupying public property. The presence of a dangerous weapon by an unstable person on public property is plainly of legitimate concern to law enforcement officers. Third, the police used less-than-lethal force after the passage of several hours of a stand-off and negotiations that had yet to succeed in convincing Devine to surrender his gun. The passage of time to allow consideration and resort to non-force alternatives is plainly significant to assessing the reasonableness of a later use of force by the police.

Accordingly, for qualified immunity purposes, the appropriate inquiry here is whether an objectively reasonably law enforcement would have known it to violate the Constitution to use less-than-lethal force against a suicidal and armed man on public property and who has refused to surrender his loaded gun after several hours of negotiation with the police. In light of this inquiry, it is clear to me that an objectively reasonable law enforcement officer would not have known that defendants' use of less-than-lethal force amounted to a violation of the constitutional rights of Timothy Devine.

To be sure, it is debatable whether defendants acted wisely when they decided to deploy the batons against Devine at the time and in the manner that they did. There was no immediate urgency that required the officers to break off negotiations and to deploy any force at all. Devine

---

not worth less than the life of other persons. What matters is that defendants knew Devine to be acutely suicidal, not the underlying reasons why Devine was in distress and considering ending his life.

had not threatened to shoot the police, and there was otherwise no threat to innocent civilians or passersby.

Moreover, viewing the facts in the light most favorable to plaintiff, I have to accept that Douchette warned defendants that the baton tactic would not prove effective against Devine. Indeed, after the first round of batons did not work—and in view that Devine warned the officers to stop or that he would take his life—it is questionable whether it remained a sound decision for officers to engage Devine yet again with a second round of batons.

Still, my role is not to decide if the officers chose wisely but to decide if they chose unconstitutionally. As the Supreme Court has again recently emphasized, courts may not "judge officers with the 20/20 vision of hindsight," and a plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City and County of San Francisco,* 135 S. Ct. at 1777.

It is reasonable to believe that there should be some endpoint to negotiations when an armed and suicidal man occupies a portion of a public university campus. The Constitution does not compel the police to wait indefinitely and at the mercy of a troubled and unstable mind. Whether the endpoint should have been after three hours, five hours, or ten hours is debatable. But, as plaintiff's counsel himself conceded during oral argument, the use of less-than-lethal force *at some point* was reasonable. And here the defendants did not resort to force until five hours or more of a stand-off with Devine.

Plaintiff argues that defendants did not prioritize Devine's life, that they were disgusted by the criminal allegations against him, and that they were intent on simply resolving the stand-off, whether peacefully or through provoking Devine to commit suicide. But this argument ignores that the subjective motivations of a law enforcement officer is not relevant to a Fourth

Amendment analysis, much less to a determination whether the officer's conduct was objectively unreasonable in light of the facts known to him and in light of clearly established law. *See Graham*, 490 U.S. at 397; *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004).

It is also significant to me that the Connecticut State Police's operations manual explicitly provides for the use of "less lethal" force like the type of batons that were used here and in the type of situation that the police confronted here. The manual provides that "less lethal impact projectiles are defined as those munitions, which can be fired, launched or otherwise propelled for the purpose of encouraging compliance, overcoming resistance or preventing serious injury without posing a significant potential of causing death." Doc. #24-1 at 11 (quoting Connecticut State Police, Administration and Operations Manual). It provides that "examples of less lethal munitions include beanbag rounds, launch-able wooden, foam or rubber batons, rubber pellets and like items." *Ibid.*

The manual further provides that "less than lethal munitions may be considered" for a variety of situations "such as barricaded subjects threatening suicide" or "mentally unstable persons armed with a deadly weapon or dangerous instrument threatening imminent use of these weapons to harm themselves or others." *Id.* at 12. In addition, the manual states that "tactical operations involving barricaded or suicidal individuals should *normally include* an option for less lethal force." *Id.* at 13 (emphasis added).

The police are hardly to be faulted for devising strategies designed to use less-than-lethal force as an alternative to the more drastic and immediate use of deadly force. This is not to say that the guidance of a state police manual determines *ab initio* what conduct is constitutionally lawful. *See, e.g., Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). But the guidance of a departmental manual may be at least relevant to deciding whether any individual

13

police officer within that department should know that what he or she was doing was unlawful. *Cf.* Rachel Harmon, *When Is Police Violence Justified*, 102 Nw. U. L. Rev. 1119, 1179-80 (2008) (advocating incorporation into Fourth Amendment doctrine of proportionality limits of the type that police have already adopted as part of their own training).

Plaintiff has not identified case precedent that would warrant a conclusion that defendants would or should have known their actions to violate Devine's constitutional rights. The most analogous precedent from within the Second Circuit is *Fortunati v. Campagne*, 681 F. Supp. 2d 528 (D. Vt. 2009), *aff'd sub nom. Fortunati v. Vermont,* 503 F. App'x 78 (2d Cir. 2012), a case that was decided by published opinion of a district court more than two years before the death of Devine and then affirmed by the Second Circuit several months after the death of Devine. Both courts concluded that qualified immunity precluded liability against the police for use of less-than-lethal force against an armed man who would not surrender to the police. The man—who was believed to be armed and dangerously mentally ill—refused to move his forest campsite after being asked to do so by law enforcement officers; instead, he retreated into the woods and ran around erratically with a gun. In response, the police used less-than-lethal force and fired rounds of beanbag-like ammunition at him. *See Fortunati,* 681 F. Supp.2d at 532-34. When the man responded by pulling the gun from his waistband, the officers countered by firing lethal shots at him. *Id.* at 534. Both the District of Vermont and the Second Circuit concluded that the officers were entitled to qualified immunity and, specifically, that the officers' use of less-than-lethal force had been objectively reasonable, despite the fact that this use of force had led in turn to the man's actions that resulted in his death. *Id.* at 541; *Fortunati*, 503 Fed. Appx. at 81.

Nor did holdings from courts outside the Second Circuit make clear at the time of the incident in question that defendants' conduct was not merely ill-advised but outright

unconstitutional. To the contrary, at the time of the incident in this case, two federal appeals courts had declined to impose constitutional liability against police officers for the use of less-than-lethal force in the course of confrontations with suicidal men. *See Bell v. Irwin*, 321 F.3d 637, 639-40 (7th Cir. 2003) (police did not use constitutionally excessive force when they used a beanbag projectile gun to shoot a drunk and suicidal man who had knives and who leaned toward a propane tank with a cigarette lighter; "it was reasonable to use force to end the confrontation and avoid any risk that Douglas would injure himself or others"); *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1278-79 (10th Cir. 2003) (police did not use constitutionally excessive force when they shot a rubber baton through a house window, which in turn prompted a suicidal man who was inside and negotiating during a stand-off with the police to shoot and kill himself).

Plaintiffs primarily rely on *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), in which the Ninth Circuit reversed a district court's grant of summary judgment for defendants in a case involving the police's use of a less-than-lethal beanbag shotgun against a suicidal man. The facts of the *Glenn* case differ in two key respects from the case now before me. First, the suicidal man in *Glenn* was armed with a pocketknife, not a loaded handgun. Second, the police in *Glenn* deployed the beanbag gun against the suicidal man within only three minutes of arriving on the scene and then, when the man tried to retreat from the beanbag fusillade, the police immediately followed by firing on him repeatedly with bullets and killing him. The *Glenn* case does not closely resemble the facts of this case in which Devine had a loaded gun and in which the police waited several hours and attempted extensive negotiations before resorting to the use of less-than-lethal force.

Nor does the *Glenn* decision more broadly stand for the proposition that the Constitution categorically prevents the police from using force to resolve a confrontation with a suicidal man. True enough, the Ninth Circuit court cautioned that it was "aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide," and that that "it would be odd to permit officers to use force capable of causing serious injury or death in an effort to prevent the possibility that an individual might attempt to harm only himself." *Glenn,* 673 F.3d at 872. It then noted, however, that "[w]e do not rule out that in some circumstances [that] some force might be warranted to prevent suicide, but in cases like this one the 'solution' could be worse than the problem." *Ibid.*

Other case precedent relied on by plaintiff is equally distinguishable from the facts of this case, because these other cases do not involve the use of less-than-lethal force against a suicidal person who is armed with a gun on public property and/or do not involve the use of less-than-lethal force only after several hours of negotiations have failed to resolve a stand-off. For example, in *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), a police officer used a beanbag shotgun to shoot a mentally unstable man in the face while the man was walking in the yard of his own property and carrying a container of lighter fluid. *Id.* at 1277-78. The Ninth Circuit understandably declared this use of force unreasonable and not subject to qualified immunity. *Id*. at 1279-86.

In *Phillips v. Community Insurance Corp*., 678 F.3d 513 (7th Cir. 2012), the police repeatedly used polyurethane bullets against an intoxicated and unarmed woman who refused to get out of her parked car despite police command. The Seventh Circuit not surprisingly held that the use of force in response to no more than the woman's passive non-compliance was constitutionally excessive and not subject to qualified immunity. *Id.* at 519-30.

In *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), a police officer fired a polyurethane baton at a suicidal man's head from a distance of six feet away. The Eleventh Circuit held that there was a genuine issue of fact to suggest that this use of force was unreasonable and not subject to qualified immunity, because the suicidal man was armed only with a knife, because he had not threatened officers, because there had not been any negotiations to secure the man's surrender, and because the officer aimed for the suicidal man's head contrary to police manual policy. *Id.* at 1156-59. All these cases are far different than the facts presented here.

In short, each of the police defendants in this case is entitled to qualified immunity. Even viewing the facts in the light most favorable to plaintiff, I conclude that an objectively reasonable law enforcement officer would not have known that the use of less-than-lethal force against Devine in the circumstances as they presented themselves here would violate his constitutional right to be free from the use of excessive force.

### *State Law Wrongful Death Claims*

The complaint further alleges wrongful death claims due to negligence, gross negligence, and recklessness. Although plaintiff concedes that the negligence and gross negligence claims are barred by sovereign immunity, defendants do not contest that sovereign immunity does not bar the recklessness claim. In any event, because plaintiff's federal constitutional claim will be dismissed, I decline to exercise supplemental jurisdiction over the remaining state law wrongful death claim. See 28 U.S.C. § 1367(c)(3); *see, e.g., Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013); *see also Pickering v. Mercado*, 2006 WL 1026677, at *8-*9 (E.D.N.Y. 2006) (granting summary judgment for defendant on federal constitutional excessive force claim and declining to exercise supplemental jurisdiction over state law claims

for negligence and wrongful death). Especially because the parties have devoted very little briefing to the state law claims and because this matter involves the liability of state law enforcement officers under state law, I conclude that the exercise of continuing supplemental jurisdiction would not be appropriate in lieu of allowing the parties to resolve any remaining dispute before a state court of Connecticut.

## CONCLUSION

For the foregoing reasons, I GRANT defendants' motion for summary judgment (Doc. #24) with respect to plaintiff's constitutional claim of excessive force, on the ground that defendants have qualified immunity. I otherwise DISMISS without prejudice plaintiff's remaining state law claims for wrongful death.

The Clerk is directed to close this case.

It is so ordered.

Dated at New Haven this 14th day of January 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge